WARNER, J.
 

 We grant appellees’ motions for rehearing, withdraw our previously issued opinion and substitute the following in its place.
 

 This is an appeal of a final judgment determining that the beneficiaries of a trust did not have standing to challenge certain pre-death distributions and expenditures from the trust by the trustee and the settlor/decedent’s attorney-in-fact, because the expenditures and distributions were within the discretion allowed to the trustee under the terms of the trust. We reverse, because the beneficiaries did have standing, and an evidentiary hearing was required to determine whether the expenditures and distributions were a breach of fiduciary duty.
 

 This is the second appearance of this case in this court. The underlying facts may be read in
 
 Siegel v. Novak (“Siegel I”),
 
 920 So.2d 89 (Fla. 4th DCA 2006). Briefly, Dorothy H. Rautbord established a trust to benefit her for her life, with the remainder to be distributed to her children who survived her, including her sons, Daniel and Simon Siegel. The trust permitted the trustee to pay from income and principal, so much “as the Trustee, in its sole discretion, shall deem appropriate or advisable for the support, maintenance, health, comfort or general welfare of the Settlor [Rautbord].” It reserved to the settlor alone the power of amendment, modification and revocation, in whole or in part, specifically excluding an attorney-in-fact from exercising those powers. That is important, because Rautbord also executed a power of attorney to her daughter, No-vak, giving her multiple powers, including the power to make gifts to individuals or charitable organizations “provided that such gift either (i) shall be reasonably consistent with any pattern of my giving or with my estate plan or (ii) shall not exceed the annual exclusion available from time to time for federal gift tax purpose.” The power of attorney specifically excluded any power to revoke or amend or withdraw principal from any trust where Rautbord had reserved the power to amend or revoke.
 

 Rautbord appointed JP Morgan Chase Bank as her trustee in 1995, at which time the trust was also amended to provide that New York law would govern the trust. In addition, another trust amendment provided that the trustee could relocate the trust corpus, which JP Morgan did in 2008, transferring the assets to Florida. At some point after the execution of the 1995 amendment, Rautbord developed severe dementia.
 

 As noted in
 
 Siegel I,
 
 during Rautbord’s lifetime Novak made large withdrawals of principal from the trust by signing revocation letters, which the trustee approved. In addition, the trust issued checks for many gifts, and the trustee spent considerable amounts for what is termed Raut-bord’s general welfare.
 

 Rautbord died in 2002. After her death, JP Morgan Chase Bank filed a complaint for a judicial accounting pursuant to chapter 737, Florida Statutes, seeking a discharge from liability for its actions as trustee. The Siegels — Daniel and Simon Siegel, along with Simon’s wife Beverly and two children, Randy and Nancy — filed an answer and affirmative defenses, alleging that some of the trustee
 
 *938
 
 expenditures may not have been made for purposes specified in the trust, namely the support, maintenance and general welfare of Rautbord. The trial court granted JP Morgan’s motion for summary judgment, finding that the Siegels lacked standing to challenge any distributions made prior to Rautbord’s death, because the trust was revocable, and the brothers had no present interest in the trust assets during their mother’s life.
 

 In
 
 Siegel I,
 
 Judge Gross detailed New York law and concluded that the brothers did have standing to challenge the trust distributions. Specifically, the opinion held:
 

 [U]nder New York law, after the death of the settlor, the beneficiaries of a revocable trust have standing to challenge pre-death withdrawals from the trust which are outside of the purposes authorized by the trust
 
 and
 
 which were not approved or ratified by the settlor personally or through a method contemplated through the trust instrument. By outside the purposes of the trust we mean any expenditures that were not “appropriate or advisable for the support, maintenance, health, comfort or general welfare of’ Mrs. Rautbord.
 

 Id.
 
 at 95-96 (emphasis in original). Explaining this holding, Judge Gross relied on New York law, which governs the trust:
 

 The court in
 
 Estate of Morse,
 
 177 Misc.2d 43, 676 N.Y.S.2d 407, 409 (N.Y.Sur.1998), described the broad reach of New York’s concept of standing:
 

 In that light, it has been noted that “anyone who would be deprived of property in the broad sense of the word ... is authorized to appear and be heard upon the subject” of whether a will that would thus affect him adversely should be admitted to probate
 
 (Matter of Davis,
 
 182 N.Y. [468, 472, 75 N.E. 530 (N.Y.1905) ]). Accordingly, standing to object to probate does not require an interest that is “absolute”; a contingent interest will be enough
 
 (see Matter of Silverman,
 
 91 Misc.2d 125, 397 N.Y.S.2d 319). In other words, the uncertainty of an interest should not preclude its holder from seeking to protect it, i.e., she should have standing to object to a propounded instrument that makes the possibility of benefit even more remote or eliminates such possibility entirely.
 

 Id.
 
 at 95-96. Judge Gross noted, “With an interest in the corpus of the trust after the death of their mother, the Siegels
 
 have standing to challenge the disbursements;
 
 they have alleged a concrete and immediate injury, caused by Novak and the Bank, which could be redressed by the circuit court. Without this remedy, wrongdoing concealed from a settlor during her lifetime would be rewarded.”
 
 Id.
 
 at 96 (emphasis added).
 

 Following remand, JP Morgan filed an amended complaint, and the Siegels filed a counterclaim for breach of fiduciary duty, as well as a cross-claim against Novak for an accounting, breach of fiduciary duty, and for interference with an expectancy. The central issue involved the propriety of distributions authorized by the trustee pri- or to the death of Rautbord. The Siegels alleged that although Novak, as attorney-in-fact, had the power to make gifts, she did not have the power to revoke the trust. Despite this, she signed letters of partial revocation of substantial portions of the trust assets, which JP Morgan routinely approved, contrary to the practice of the predecessor trustee, who refused to make distributions as gifts because Rautbord had been taken advantage of because of her generosity.
 

 The Siegels challenged four categories of distributions. First, JP Morgan had
 
 *939
 
 issued 111 checks for gifts to friends and family from 1995 to 2002. Some of the recipients were employees of Novak and the JP Morgan employee in charge of administering the trust. In addition, some of those gifts incurred gift tax liability, contrary to the specific provisions of the power of attorney. Second, Novak, as attorney-in-fact, forgave substantial debts owed to Rautbord, claiming that these were in fact gifts. Third, the trust agreement provided that, upon Rautbord’s death, a trust for the benefit of her sister-in-law, Ruth Haas, would be established. Despite the trust’s terms, Novak established the trust, and the trustee distributed funds to create it prior to Rautbord’s death, causing a substantial gift tax liability. Fourth, the Siegels challenged the excessive expenditures for the “welfare” of Rautbord.
 

 In an effort to streamline the trial of the action, JP Morgan moved for a preliminary determination “as to whether the Sie-gels have standing with respect to each distribution that they seek to challenge.” In its motion, it pointed to
 
 Siegel I
 
 and argued that the Siegels had standing to challenge
 
 only
 
 “those trust distributions that were outside of the purposes authorized by the discretionary invasion standard set forth in the trust.” Noting that the Siegels had identified approximately 75 distinct trust expenditures that they intended to challenge at trial, JP Morgan suggested that the court first hear evidence and make a determination as to whether those expenditures were “appropriate or advisable for the support, maintenance, health, comfort or general welfare of’ Mrs. Rautbord.
 

 At the commencement of the trial, JP Morgan again suggested that the court first determine the “standing” issue. The Siegels’ attorney agreed that issues regarding the interpretation of the documents were questions of law and that whether the documents allowed disbursement of trust funds to third parties as gifts could be determined first by the court. The court then granted the motion and directed that it first make the determination of the Siegels’ standing to make objections.
 

 The parties proceeded to give argument to the court both on the law and the facts as to why the trust instrument did or did not permit gifts by the trustee or the attorney-in-fact. At the end of the argument, the parties agreed that the court could decide whether the trust instrument authorized the making of gifts. The court stated, “You would like me to come back with a decision as to whether the language of the trust authorized the trustee to invade the principal of the trust to make gifts.” The Siegels’ attorney added, “Principal and income and as to Judy Novak, whether or not the paragraph 3, subsection 6, in the durable power of attorney prohibited her from modifying or revoking or withdrawing principal from the 1990 trust.” Novak’s attorney objected and instead requested the court to determine “whether the gifts authorized by Judy No-vak were appropriate” under the power of attorney. He urged the court to determine whether the gifts were approved or ratified by the settlor, to which the Siegels’ attorney stated that this would require the presentation of additional evidence. They objected to the court making these determinations.
 

 The next day the court delivered its order on the preliminary issue of standing. In it, the court stated the question as follows:
 

 More specifically, the Court is to decide whether the challenged withdrawals from the Trust are outside the purposes authorized by the Trust (that is, not appropriate or advisable for the support, maintenance, health, comfort or general welfare of Ms. Rautbord), and were not
 
 *940
 
 approved or ratified by the settlor personally or through a method contemplated through the Trust instrument. By consent, the parties also tried the issue of the propriety of the actions of Ms. Novak, Ms. Rautbord’s attorney-in-fact, with respect to these transactions.
 

 The court then made specific findings with respect to each category of challenged expenditures. The first category “deals with expenditures for birthday parties, health expense, pets, etc. On their face, they seem appropriate or advisable for the support, maintenance, health, comfort, or general welfare of the settlor, Mrs. Raut-bord. Accordingly, the Siegels have NO STANDING to challenge these expenditures from the Trust.” The second category included the forgiveness of debts, owed to Ms. Rautbord, by the attorney-in-fact. The court noted that no details were presented in the arguments. “However, assuming the debts were forgiven by Ms. Rautbord’s attorney-in-fact, Ms. Novak, such forgiveness is an appropriate and valid exercise of Novak’s broad powers set forth in Section II of the Florida Durable Power of Attorney (JPM — 9). The provisions of section III of that Power of Attorney do not prohibit the forgiveness of the debts set forth in List B.” The court equated the power to make gifts with the power to forgive debts. As to the third category, which included the expenses incurred by the trust in making gifts that exceeded the gift tax exclusion for federal income tax purposes, as well as the premature funding of the Ruth Hass trust, the court concluded that these too were within the broad power of gifting, as they were consistent with a long history of gifting by Mrs. Rautbord. Likewise, the court concluded that the final category of gifts to employees, friends and relatives also continued Mrs. Rautbord’s history of gift giving. The court supported its conclusions with a finding that no showing of lack of good faith on the part of the attorney-in-fact had been made. The court essentially found that all gifts in each category were permitted. Thus, the court found that the Siegels had no standing to challenge them. From this order, the Siegels appeal.
 

 From a reading of the transcript of the trial, it is clear to us that no agreement actually existed as to what would constitute this “preliminary” determination of standing. The Siegels suggested that the court interpret the documents and decide whether the trustee and attorney-in-fact had the
 
 power
 
 to gift from the trust. JP Morgan appeared to agree with this limited determination. Novak expanded it to ask the court to determine whether the particular gifts were appropriate and not outside the purposes authorized in the trust. The court decided the latter as well as the former questions. In other words, not only did it decide that gifts generally were authorized by the terms of the trust and power of attorney, it also decided that each of the gifts made was authorized, as were all of the various other challenged expenses. We think the trial court went beyond the issues which all parties agreed to submit as a preliminary issue of standing.
 

 In any event, the trial court and parties did not interpret
 
 Siegel I
 
 correctly. Our opinion in
 
 Siegel I
 
 determined that the Siegels
 
 did
 
 have standing to challenge the trustee’s actions, because they had a direct interest in the corpus of the trust after their mother’s death. The issue of whether the withdrawals and expenses were appropriate and authorized was not a preliminary standing question but the entire substance of the proceeding, i.e., whether the trustee and attorney-in-fact breached their fiduciary duties. The trial court incorrectly treated the question of whether the withdrawals were appropriate and authorized as a question of standing. We do not conclude that the Siegels con
 
 *941
 
 sented to this interpretation or waived their right to challenge specific expenses as unauthorized. The Siegels agreed that the court could make a legal determination as to whether the trust agreement and power of attorney authorized gifts. They did not agree that the court could simply determine from that legal issue that each of the gifts given was authorized, as we shall explain.
 

 In
 
 Siegel I
 
 we noted that New York law should be applied to the substantive matters in this case. This included both a determination of standing and the construction of the trust instrument. The interpretation of the various documents is a question of law.
 
 See Gitelson v. Du Pont,
 
 17 N.Y.2d 46, 268 N.Y.S.2d 11, 215 N.E.2d 336 (1966). We review questions of law
 
 de novo. See, e.g., Davis v. Rex,
 
 876 So.2d 609, 613 (Fla. 4th DCA 2004).
 

 The trial court found that the trustee had the power to pay gifts from the trust, because the power of attorney contained a specific power of the attorney-in-fact to make gifts. Because the gifts were within that broad power, the trustee acted appropriately in making expenditures for such gifts as requested or directed by No-vak. The gifts were part of a long history of generosity on behalf of the settlor, and they were “appropriate or advisable for the support, maintenance, health, comfort, or general welfare of Ms. Rautbord.” The court was incorrect in its interpretation of the trust instrument.
 

 The trust agreement gives no power to the trustee to make gifts. The trustee does have the power to invade the principal for the welfare of the settlor. Specifically, the trustee had the power to disburse income and principal “for the support, maintenance, health, comfort, or general welfare of the Settlor.” The power of attorney, on the other hand, gives the attorney the power to gift as follows:
 

 To make any gift, either outright or in trust, to any individual (including my Attorney-in-Fact) or any charitable organization,
 
 provided that any such gift either (i) shall be reasonably consistent with any pattern of my giving or with my estate plan or (ii) shall not exceed the annual exclusion available from time to time for federal gift tax purposes.
 

 (Emphasis added). Significantly, the power of attorney also prohibited the attorney-in-fact from invading the principal of the trust by stating that the attorney in fact was
 
 not
 
 granted the power “[t]o amend, modify or revoke, in whole or in part, or withdraw any of the principal of, any trust over which I have reserved or have been granted such power....”. The trust agreement specifically provided that the power of amendment, modification, and revocation were personal to the settlor and could not be exercised by her attorney-in-fact. Thus, the power of attorney specifically prohibited the attorney-in-fact from exercising the power Mrs. Rautbord reserved to herself to revoke the trust. The Siegels claim that the attorney-in-fact attempted to do just that by signing letters of partial revocation to the Trustee to withdraw principal. The trial court’s ruling on standing prevented this issue from being litigated.
 

 Despite the lack of power of the trustee to make gifts, the trustee made gifts and permitted Novak to withdraw principal to pay other gifts. The trustee had no authority to make gifts itself. We can find no legal support which holds that gifts to others can constitute payments for the “comfort or general welfare” of the beneficiary of a trust. Nevertheless, such a finding must be based upon a factual record, which the trial court did not have in concluding otherwise.
 

 
 *942
 
 The Siegels cite
 
 Kemp v. Paterson,
 
 4 A.D.2d 153, 163 N.Y.S.2d 245 (1957), which provides some support for the proposition that the clause does not include giving away principal to others. In
 
 Kemp,
 
 a set-tlor created a trust providing for the payment of income during the life of the set-tlor to the settlor’s mother. However, should the settlor die before her mother, then the income would continue to be paid to the mother and then to the settlor’s daughter. Upon the daughter’s death the corpus would be distributed to the daughter’s issue, or if none, to other designated persons. The mother died and the daughter became the recipient of the income of the trust. Pursuant to a term of the trust which permitted the trustees to pay over so much of the principal of the trust from time to time as the trustees deemed in the “best interest” of the daughter, the trustees distributed the entire principal to the daughter. The trustees argued that giving the entire amount to the daughter would permit her to utilize the funds to support her children and would permit her to transfer some of the property to her own children, free of estate taxes.
 

 When brought before the trial court for approval, the court concluded that the termination of the trust was within the trustees’ discretion, so long as they were acting in good faith. The appellate court disagreed. In concluding that the trustees had not shown that termination of the trust was in the “best interest” of the beneficiary, the court noted:
 

 While undoubtedly, in a sense, these purposes will serve the beneficiary’s “best interest”, the latter words must be interpreted not in the broadest meaning but in a manner which is consistent with the trust deed. Her “best interest” must be judged within the framework of the status bestowed upon her by the settlor, the status of a life beneficiary, not of a recipient of the entire trust res.
 

 In creating a trust, the settlor was not merely designating trustees as conduits through whom a gift could be made to the daughter whenever it would be to her advantage. The trust represented a plan of the settlor that included not only the beneficiary Margaret, but also re-maindermen. In adding a flexible provision for the invasion of principal for the “best interest” of the beneficiary, the settlor was not injecting a facile means for destroying the trust.
 

 By limiting the invasion of principal to those instances where it will be for the “best interest” of the beneficiary, the settlor was, in effect, restricting the power of the trustees, and imposing a duty on them to limit such invasion for such objects and purposes as, in their judgment, would be beneficial to the
 
 ces-tui que trust.
 

 Kemp,
 
 4 A.D.2d at 156, 163 N.Y.S.2d 245. Applying that reasoning to the facts of this ease, the trust
 
 restricted
 
 the power of the trustees and imposed a duty to invade principal only for the “support, maintenance, health, comfort or general welfare
 
 of the Settlor.”
 
 Furthermore, the trust had significant provisions to dispose of the trust property on her death to specific persons. Thus, the settlor had a purpose not only to benefit herself during her lifetime but to benefit specific other persons. Permitting the trustee to deplete the trust principal by lavishing gifts on others does not provide for the support or welfare of the settlor and disregards the duty to the remainderman. The trial court erred in its preliminary legal determination that the trust instrument permitted the trustee to make gifts.
 

 The trial court should not have relied on the attorney-in-fact’s authority to gift as indirect support for its granting of gifts. First, the power of attorney limited such gifts to those which were consistent
 
 *943
 
 with Ms. Rautbord’s pattern of giving or her estate plan. That is a fact question, requiring proof of the pattern of giving. That Ms. Rautbord was a generous person does not establish that her pattern of giving would include the gifts made in this case, particularly when some of the gifts went to employees of the attorney-in-fact and to the trustee, as well as persons whom she did not know. Secondly, and more importantly, the attorney-in-fact was prohibited from revoking the trust. Only Ms. Rautbord had that power. The durable power of attorney prohibited the attorney-in-fact from exercising the power “to revoke, in whole or in part” any trust where the settlor reserved that power to herself. At least some authority refuses to recognize a distinction between a partial revocation and a withdrawal of principal.
 
 See In re Shapley’s Deed of Trust,
 
 353 Pa. 499, 46 A.2d 227 (1946) (“We are not prepared to recognize a distinction between settlor’s right to withdraw principal from the trust and his right to revoke the trust in whole or in part. Both cause an amendment or partial revocation, and with the same legal effect. For example: If a set-tlor placed $100,000 in an inter vivos trust, with all the reservations hereinbefore discussed, and subsequently concluded to reduce the trust to $50,000, there would seem to be no difference in principle if settlor by written instrument revoked or modified the trust by reducing it by one-half, or exercised his right to withdraw one-half from the operation of the trust.”). A determination of whether these withdrawals of principal constitute partial revocations of the trust should await the full development of the evidentiary record on each transaction.
 

 While not directly on point,
 
 In re Mueller,
 
 19 Misc.3d 536, 853 N.Y.S.2d 245 (N.Y.Sur.2008), is an example of the misuse of a power to gift by an attorney-in-fact. There, a 98-year-old woman gave a power of attorney to her neighbor. The instrument included a broad power to make gifts, including gifts to the attorney-in-fact. The neighbor then used this power, transferring all of the woman’s accounts and property to himself. After her death, when her heirs sued to set aside the transfers, the attorney-in-fact defended based upon the provision of the power of attorney absolving the attorney-in-fact of all liability to her estate or heirs for any act done under the power of attorney. The court rejected this claim. In doing so it noted:
 

 Respondent’s use of the POA is a classic example of how such an instrument may be abused by an attorney-in-fact for his personal benefit. At his deposition respondent admitted that he transferred to himself or his mother virtually all of decedent’s liquid assets and secured a life tenancy in the real property.
 

 19 Misc.3d at 541, 853 N.Y.S.2d 245. The court concluded that a clause which seeks to exonerate an attorney-in-fact from any and all liability runs afoul of the spirit of New York’s public policy and the duty of an attorney-in-fact as established under
 
 Ferrara [Matter of Ferrara,
 
 7 N.Y.3d 244, 819 N.Y.S.2d 215, 852 N.E.2d 138 (2006) ].
 
 Ferrara,
 
 in turn, held that an attorney-in-fact must act in the best interests of the principal, which is consistent with the fiduciary duties that the courts have imposed on the attorney-in-fact.
 

 “[A] power of attorney ... is clearly given with the intent that the attorney-in-fact will utilize that power for the benefit of the principal”
 
 (Mantella v. Mantella,
 
 268 A.D.2d 852, 852, [701 N.Y.S.2d 715] [3d Dept.2000] [internal quotation marks and citation omitted]). Because “[t]he relationship of an attorney-in-fact to his principal is that of agent and principal ..., the attorney-in-fact must act in the utmost good faith
 
 *944
 
 and undivided loyalty toward the principal, and must act in accordance with the highest principles of morality, fidelity, loyalty and fan* dealing”
 
 (Semmler v. Naples,
 
 166 A.D.2d 751, 752, [563 N.Y.S.2d 116] [3d Dept.1990] [internal quotation marks and citations omitted]).
 

 Ferrara,
 
 7 N.Y.3d at 254, 819 N.Y.S.2d 215, 852 N.E.2d at 144. Although the power of attorney in this case was a Florida durable power of attorney, Florida law states that an attorney-in-fact must exercise the powers conferred as a fiduciary.
 
 See, e.g., In re Estate of Schriver,
 
 441 So.2d 1105 (Fla. 5th' DCA 1983); § 709.08(8), Fla. Stat. (2011). Therefore, the principles of the foregoing case are applicable as they also consider an attorney-in-fact a fiduciary.
 

 We do not mean to suggest that the attorney-in-fact has exercised her power to gift to enrich herself. In fact, it does not appear that she made any substantial gifts to herself, even though the terms of the power of attorney permitted them. However, the fact that substantial gifts were given to so many people suggests that the power to gift was not exercised with Mrs. Rautbord’s best interests in mind. Whether the gifts that she made as attorney-in-fact were in the best interest of Mrs. Raut-bord is an issue of fact for determination by the court. Nevertheless, where the gifts were made from substantial invasion of principal, which if tantamount to a partial revocation was beyond the powers assigned to the attorney-in-fact, that alone at least suggests that she breached her fiduciary duty and did not act in the best interest of her principal. A trial on this issue is required.
 

 Because we conclude that the trustee did not have the power to gift, the trial court’s justification for the pre-death funding of the trust for Carl and Ruth Haas also fails. Here, however, a specific provision of the trust provided that the trust be funded at the settlor’s death, undoubtedly to avoid the substantial gift taxes that the trust ended up paying to set up the trust during the settlor’s lifetime. “[T]he trust instrument is to be construed as written and the settlor’s intention determined solely from the unambiguous language of the instrument itself.”
 
 See Matter of Chase Manhattan Bank,
 
 6 N.Y.3d 456, 460, 813 N.Y.S.2d 361, 846 N.E.2d 806 (2006) (citation omitted). The settlor unmistakably directed the creation of the trust on her death. The premature funding of the trust violated its terms, and the trial court erred in concluding otherwise. We remand this issue for an evidentiary hearing, because the trustee raised various affirmative defenses to this claim including waiver.
 

 As to the forgiveness of debts, which the trial court also justified by the power to gift, we must remand for further consideration. First, as noted above, a determination must be made as to whether those gifts were consistent with the settlor’s pattern of giving and in her best interests. Second, we do not know whether the forgiven notes were an asset of the trust. If so, the attorney-in-fact has no power over the principal of the trust. She had no specific power to essentially dispose of a trust asset.
 

 Finally, the Siegels objected to expenditures for Mrs. Rautbord such as for lavish birthday parties, airline tickets for friends, health expenses, pets, and similar items. The trial court, without any evidence whatsoever, found that “on their face, they seem appropriate or advisable for the support, maintenance, health, comfort, or general welfare of the settlor, Ms. Rautbord.”
 

 The trust instrument gives the trustee authority to “pay to or apply for the benefit of the Settlor, at any time or from time to time, so much or all of the net income and principal thereof as the trus
 
 *945
 
 tee,
 
 m its sole discretion,
 
 shall deem appropriate or advisable for the support, maintenance, health, comfort or general welfare of the Settlor.” Under New York law, even though the trustee has the sole discretion to determine the appropriateness of expenditures, it does not foreclose all inquiry by a court of the proper use of such discretion.
 
 See In re Lyons’ Estate,
 
 13 Misc.2d 287, 176 N.Y.S.2d 769 (N.Y.Sur.1958). “[T]he court has the responsibility to ensure that the trustees do not abuse their discretion. Accordingly, the court has the authority to correct abuses in the exercise of absolute discretion that are arbitrary or the result of bad faith.”
 
 In re Goodman,
 
 7 Misc.3d 893, 901, 790 N.Y.S.2d 837 (N.Y.Sur.2005). Where distributions fall within a class of expenditures authorized by the trust, a trustee must still act reasonably and with good faith in carrying out the terms of the trust.
 
 See In re Estate of Wallens,
 
 9 N.Y.3d 117, 122, 847 N.Y.S.2d 156, 877 N.E.2d 960 (2007). In
 
 Wallens,
 
 the court required a hearing to determine whether the expenditures were authorized and in the best interests of the beneficiary. Similarly, in this ease, the trial court had no evidence before it to determine whether some of the expenses fall within the trustee’s duty to provide for Mrs. Rautbord’s support, care, comfort, and general welfare. We likewise remand for a hearing to make this determination.
 

 We affirm without further comment on the other issues raised on appeal. We dismiss the “cross-appeal” as untimely. The cross-appealed order was a final order entered in 2006 which should have been appealed within 30 days of its rendition.
 
 See Pearson v. Cobb,
 
 701 So.2d 649, 650 (Fla. 5th DCA 1997). Even if it were not untimely, we would find no error in the court’s construction of the settlement agreement.
 

 In conclusion, we reverse for a trial on the issues addressed in this opinion. We have determined that the trial court erred in disposing of the entire case on the issue of standing contrary to our prior opinion which determined that appellants did have standing to contest the various expenditures. They now must have the opportunity to present evidence to support their claims of breach of fiduciary duty by both the trustee and the attorney-in-fact. Likewise, the appellees have the right to defend and offer proof of their affirmative defenses.
 

 Reversed in part; affirmed in part; and remanded for further proceedings consistent with this opinion.
 

 POLEN and LEVINE, JJ., concur.